IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KIMBERLY J.,[1] ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:22-CV-704 |
| ) | |
| v. ) | |
| ) | REPORT & RECOMMENDATION |
| MARTIN O'MALLEY,[2] ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | By: C. Kailani Memmer |
| ) | United States Magistrate Judge |
| Defendant. ) | |

Plaintiff Kimberly J. ("Kimberly") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 15. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

Kimberly requested oral argument be scheduled in this case. However, having considered the administrative record, the parties' filings, and the applicable law, I find that oral argument would not aid the decisional process, and that the Commissioner's decision is supported by substantial evidence. Accordingly, and for the reasons detailed below, I respectfully recommend

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

that the presiding District Judge **DENY** Kimberly's Motion for Summary Judgment, ECF No. 7; **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 13; **AFFIRM** the Commissioner's decision denying Kimberly's claim for DIB; and **DISMISS** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Kimberly failed to demonstrate that she was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir.

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## **CLAIM HISTORY**

Kimberly filed for Title II DIB on July 21, 2020, claiming that her disability began on June 12, 2020. R. 15. Kimberly's claims were denied by the Commissioner at the initial and reconsideration levels of administrative review. R. 78–105. On March 10, 2022, Administrative Law Judge David S. Lewandowski ("ALJ") held an administrative hearing to consider Kimberly's claims. R. 35–77. Counsel represented Kimberly at the hearing, which included testimony from Kimberly and vocational expert Robert Lester, M.S. *Id*. On April 28, 2022, the ALJ entered a decision analyzing Kimberly's claims under the familiar five-step process[4] and denying her request for benefits. R. 12–34.

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); *Heckler v. Campbell,* 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

At the first step, the ALJ found Kimberly had not engaged in substantial gainful activity since June 12, 2020, the alleged onset date. R. 17. At the second step, the ALJ found Kimberly has the following severe impairments: coronary artery disease with history of myocardial infarction and stent placement; rheumatoid arthritis; obesity; left shoulder osteoarthritis; cervical stenosis; and sciatica. *Id*. Regarding Kimberly's mental impairments, the ALJ found that Kimberly had mild limitations in concentrating, persisting or maintaining pace, and no limitations in in understanding, remembering, and applying information, interacting with others, and adapting and managing herself. R. 18–20. As to the third step, the ALJ found that Kimberly's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 20–21.

> The ALJ determined that Kimberly retained the residual functional capacity ("RFC") to
>
> perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can perform occasional postural activities, but cannot crawl or climb ladders, ropes or scaffolds. She can frequently reach with her right upper extremity. The claimant can occasionally reach with her left upper extremity but cannot perform overhead reaching. She can frequently handle and finger bilaterally. The claimant should avoid concentrated exposure to temperature extremes, vibrations, and industrial hazards.

R. 21. At the fourth step, the ALJ determined that Kimberly could perform her past relevant work as an Administrative Services Manager. R. 27. At the fifth step, the ALJ found that Kimberly could perform jobs that exist in significant numbers in the national economy, such as a receptionist, appointment clerk, and data entry clerk. R. 28. Thus, the ALJ concluded a finding of "not disabled" was appropriate. R. 29. Kimberly appealed the ALJ's decision, and on November 7, 2022, the Appeals Council denied her request for review. R. 1–6. This appeal followed.

## FACTS

Kimberly was born on February 5, 1968, which classifies her as an individual closely approaching advanced age under 20 C.F.R. § 404.1563. R. 28. She has a high school education. *Id*. Kimberly previously worked as an administrative services manager and medical secretary. R. 27.

### I.     Relevant Medical Evidence

Kimberly's medical records reflect she suffers from various medical impairments including insulin dependent diabetes, rheumatoid arthritis, hypothyroidism, chest pain, heart palpitations, shortness of breath, sleep apnea, coronary artery disease, anxiety, depression, restless leg syndrome, and joint pain.

Kimberly is diagnosed with rheumatoid arthritis. On May 11, 2020, Kimberly saw Gary Bayliss, M.S., at Lewis Gale Rheumatology, for a follow-up appointment for rheumatoid arthritis and bilateral knee pain. R. 406–09. Dr. Bayliss noted she was doing "quite well" and that many of her aches and pains were treated successfully with medication. R. 406. Kimberly noted increased pain in her left shoulder and knee. *Id*. As a result, Dr. Bayliss administered Kenalog injections in Kimberly's left knee and shoulder. R. 408.

From June 12 to June 15, 2020, Kimberly was hospitalized at Carilion Roanoke Memorial Hospital for a heart attack. R. 437–62. Kimberly reported with complaints of chest pain and was treated for a non-ST elevated myocardial infarction ("NSTEMI"). *Id*. Results of imaging revealed severe stenosis of the mid LAD, requiring the placement of drug eluding stents, and an echocardiogram showed an EF 65-70% and borderline LVH. R. 460. On June 15, 2020, Kimberly was discharged in stable condition and was advised to follow up with her cardiologist. R. 458–62.

On June 23, 2020, Kimberly saw her cardiologist, Jeffrey Todd, M.D., for a follow-up appointment regarding her recent NSTEMI. R. 428–30. Dr. Todd noted Kimberly seemed "quite stable," and recommended she enroll in cardiac rehab, follow up in six months, and advised that she could return to her office type work. *Id*. On October 9, 2020, Kimberly attended a follow-up appointment with Dr. Todd for atypical chest pain. R. 860–62. Dr. Todd noted her chest pain was atypical, but improved with nitroglycerin, and prescribed Imdur to treat potential coronary or esophageal spasms. R. 862. On February 23, 2021, Kimberly presented for a cardiology exam for continued chest pain and severe dyspnea on exertion. R. 827–29. Kimberly was tachycardic on exam and had an audible blowing systolic murmur. *Id*. There was a discussion of more testing, but Kimberly elected to monitor her symptoms moving forward. *Id*.

On June 16, 2020, Kimberly saw her rheumatologist Judy Ko, M.D., for a follow-up visit. R. 739–44. Upon examination, Dr. Ko noted neck tenderness with mild pain upon motion to the left, hand nodules, bilateral ulnar deviation, left knee instability, and left hip tenderness. *Id*. Dr. Ko prescribed methotrexate and noted that Tylenol was fine to use to keep her pain under control. *Id*. Kimberly was advised to follow up in two months as it would take that much time for the methotrexate to get back into her system. *Id*. On September 4, 2020, Kimberly saw Dr. Ko for a follow-up appointment. R. 733–38. Kimberly reported the methotrexate appeared to be helping, but she still experienced some flare ups. *Id*. Dr. Ko assessed Kimberly as "doing better" from a rheumatoid arthritis standpoint and suggested a follow up appointment in three months. *Id*.

On March 12, 2021, Kimberly saw Dr. Ko for a follow-up appointment. R. 1034–39. Dr. Ko increased Kimberly's methotrexate dosage to the maximum amount of 8 tablets/week stating she believed Kimberly might benefit from the increase. R. 1039. On June 11, 2021, Kimberly

saw Dr. Ko for a follow-up appointment. R. 1024–29. Kimberly complained she was experiencing more flare ups of muscle pain, along with fatigue. R. 1028. Upon examination, Dr. Ko noted Kimberly had hand nodules, bilateral ulnar deviation, and tenderness in shoulders, hips, and spine. R. 1029. Dr. Ko continued Kimberly on methotrexate and added a muscle relaxant for her complaints of muscle pain. *Id*. Kimberly was advised to follow up with a telephonic appointment in one week to discuss blood test results and monitor her well-being. *Id*.

On June 22, 2021, Kimberly saw Dr. Ko for a follow-up appointment. R. 1023. Kimberly reported severe pain in her left shoulder claiming it affected her sleep and was so bad at times that she could not bring utensils up to her mouth to eat. *Id*. Dr. Ko noted x-rays showed some degenerative arthritis but really did not showing anything else. *Id*. As Kimberly's left shoulder pain was an ongoing, worsening problem, Dr. Ko ordered an MRI of Kimberly's left shoulder and advised her to follow up in two to three months. *Id*. The MRI results showed moderate acromioclavicular osteoarthritis and "a small moderate grade partial thickness bursal aided tear at the posterior supraspinatus footprint measuring 5mm in the sagittal plane." R. 1055–56.

On December 17, 2021, Kimberly saw Robert Glenney, M.D., for complaints of right-sided low back pain and lumbar paraspinal muscle spasms. R. 1354–59. Dr. Glenney noted Kimberly had a pending evaluation with physical therapy and prescribed Norco and Baclofen for pain and muscle spasms. *Id*.

In March 2020, Kimberly started treatment for anxiety and depression. *See* R. 1080–1158; 1198–1218; 1262–1342. On March 27, 2020, Kimberly saw Holly McCloud, LMFT ("McCloud"), a marriage and family therapist, for an initially psychotherapy intake. R. 1117–18. McCloud diagnosed Kimberly with major depressive disorder, single episode, moderate. R. 1117. From March 2020 to February 2022, Kimberly generally saw McCloud for biweekly

7

counseling sessions. McCloud's treatment notes reflect that Kimberly's mood was typically euthymic, but sometimes depressed, and her affect was appropriate, and her depression would vary from getting better or worse. R. 1090–1116, 1277–1342. McCloud also frequently noted that Kimberly was fully oriented with appropriate dress, appearance, behavior and thought content, normal speech, intact memory, good attention and concentration, and excellent insight and judgment. *Id*.

Kimberly also saw Michie Bolden, PMHNP, at Renew Psychiatry Services for mental health treatment. R. 1198–1218. On February 10, 2021, Kimberly saw Bolden for an initial psychological assessment and diagnosed Kimberly with recurrent major depression, generalized anxiety disorder, and primary insomnia. R. 1200. Bolden prescribed Zoloft for depression, Ramelteon for insomnia, and advised Kimberly to continue on Effexor and Xanax. *Id*. At her next appointment, on February 24, 2021, Kimberly reported she was "feeling a bit more calm" than prior to starting Zoloft and that her sleep was "normal" with no issues of insomnia. R. 1201. Bolden increased Kimberly's daily dosage of Zoloft. R. 1203. On March 24, 2021, Kimberly reported she was doing well with the transition to Zoloft, that her sleep and energy improved, and was able to successfully wean off of Effexor. R. 1204. Bolden noted Kimberly's affect was bright and positive, and recommended Kimberly continue with her current medication regimen. R. 1206.

On April 21, 2021, Kimberly requested an increase in Zoloft stating it was helping her mood overall. R. 1207–09. She reported no issues with sleeping and stated she felt rested most mornings. R. 1207. Bolden noted Kimberly's affect was calmer and brighter at this appointment. *Id*. Bolden increased Kimberly's daily dosage of Zoloft. R. 1209. On May 24, 2021, Kimberly reported she was doing well on her current medication regimen. R. 1210–12. Bolden noted

Kimberly's affect was brighter and recommended Kimberly continue with her current medication regimen. R. 1210. On September 13, 2021, Kimberly reported she was doing well on her current medication regimen, denied any active feelings of depression or anxiety, but noted some issues with sleep over the past week. R. 1213–15. Bolden noted Kimberly's affect was bright and recommended she continue with her current medication regimen. R. 1213. On January 10, 2022, Kimberly reported decreased motivation and energy, and requested an increase in Wellbutrin. R. 1216–18. Bolden noted Kimberly's mood was normal but apathetic, and her affect was sad/depressed. R. 1217.

## II.    Opinion Evidence

In March 2021, state agency mental health expert Leslie E. Montgomery, Ph.D., reviewed Kimberly's records and found that, although she had mental impairments of depression and anxiety, her mental impairments were non-severe and improved with medication. R. 84–86. In reviewing the four areas of mental functioning, Dr. Montgomery found Kimberly had no limitations with respect to understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing herself. R. 85. Dr. Montgomery provided the following in support of her opinion:

> The claimant has a history of anxiety and depression for which she takes medication. She has not been hospitalized for mental health reasons. She reports improvement with Effexor. Her mental status exams are normal. ADLs indicate that she is able to prepare simple meals, drive, shop, handle her finances, get along with others, and handle stress well. The overall evidence does not show a severe mental impairment.

*Id*.

On reconsideration, state agency mental health expert Stephen Saxby, Ph.D., also found Kimberly's mental impairments non-severe stating "[t]he evidence shows that [Kimberly's] depression and anxiety are well controlled by medications with no more than mild limitations in

concentration, persistence and pace." R. 101. Dr. Saxby found no limitations in the other areas of mental functioning. R. 100.

On January 31, 2022, Holly McCloud, LMFT, filled out a Medical Source Statement form regarding Kimberly's mental functioning. R. 1251–53. McCloud indicated Kimberly did not have problems interacting with the general public, being aware of hazards and taking appropriate precautions, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, accepting instructions and responding appropriately to criticism from supervisors, and sustaining an ordinary routine without special supervision. R. 1251. McCloud further indicated that Kimberly's mental abilities were "limited but satisfactory" in carrying out very short and simple instructions, maintaining attention for two-hour segments, and making simple work-related decisions. *Id*.

McCloud reported Kimberly would be "seriously limited" in remembering work-like procedures, responding appropriately to changes in a routine work setting, and dealing with normal work stress, and that she would be "unable to meet competitive standards" regarding understanding and remembering very short and simple instructions or working in coordination with or proximity to others without being unduly distracted. *Id*. Lastly, McCloud noted Kimberly has "no useful ability to function" regarding maintaining regular attendance and being punctual within customary, usually strict tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and asking simple questions or requesting assistance. *Id*.

McCloud noted her psychiatric conditions exacerbate her pain and other physical symptoms noting her stress levels from anxiety increase her overall pain and ability to focus and

10

function at work. R. 1252. She also noted she constantly has symptoms severe enough to interfere with her attention and concentration needed to perform even simple work tasks and that she would likely miss four or more days of work per month due to mental health appointments and increased pain with work. *Id*. McCloud indicated Kimberly's impairments are reasonably consistent with the symptoms and functional limitations described in her report. *Id*. She also noted Kimberly can manage her benefits in her own best interest. *Id*.

As for Kimberly's physical limitations, on April 2, 2021, state agency medical consultant Cheryl Arenella, MD, determined Kimberly could perform light work with several physical limitations. R. 78–94. Upon reconsideration, on September 8, 2021, state agency medical consultant Catherine Howard, MD, also determined Kimberly could perform light work with several limitations. R. 95–105.

## **ANALYSIS**

Kimberly alleges the ALJ erred in his decision denying her benefits claiming the following assignments of error: (1) the ALJ did not identify and resolve the apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT") pursuant to SSR 00-4p, and (2) the ALJ erred by finding Kimberly's psychological impairments were non-severe. ECF No. 8 at 11–17.

### I.  The ALJ's resolution of the apparent conflict between the vocational expert's testimony and Dictionary of Occupational Titles

Kimberly argues that the ALJ failed to resolve an apparent conflict with the Dictionary of Occupational Titles and the testimony provided by vocational expert, Robert Lester ("VE"), and, thus, the ALJ should not have relied upon the VE's testimony in his decision. ECF No. 8 at 12–15. Specifically, Kimberly contends there exists an apparent conflict between the vocational expert's testimony that an individual with Kimberly's residual functional capacity, which

11

included an ability to frequently perform reaching with the right upper extremity and occasionally perform reaching, but no overhead reaching, with the left upper extremity, and the DOT's descriptions of administrative services manager, medical secretary, receptionist, appointment clerk, and data entry clerk, all of which require frequent reaching.

When a vocational expert testifies regarding a claimant's ability to work and positions for which they are able to perform, the ALJ has a duty to identify and resolve any conflicts between the vocational expert's testimony and the DOT. *See* Social Security Ruling, ("SSR"), 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000); *Pearson v. Colvin*, 810 F.3d 204, 207–09 (4th Cir. 2015). "When there is an apparent unresolved conflict between [vocational expert] … evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] … evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 2000 WL 1898704, at *2.

Here, the ALJ relied on testimony from the vocational expert, Robert Lester, at the administrative hearing, and found Kimberly could perform her past work as an administrative services manager and medical secretary, as well as three other positions, including receptionist, appointment clerk, and data entry clerk. R. 27–28. The ALJ's RFC finding limited Kimberly to "frequently reach with her right upper extremity" and "occasionally reach with her left upper extremity but cannot perform overhead reaching." R. 21. When questioning the VE, the ALJ included these same limitations in his hypothetical question regarding the type of jobs Kimberly can perform. R. 65–66.

According to the DOT, Kimberly's past work as an administrative services manager and medical secretary, and the additional positions identified by the VE of receptionist, appointment clerk, and data entry clerk, involve "frequent" reaching, meaning one-third to two-thirds of the

12

time. *See* DOT, Manager, Office, 169.167-034, 1991 WL 647430; DOT, Medical Secretary, 201.362-014, 1991 WL 671668; DOT, Receptionist, 237.367-038, 1991 WL 672192; DOT, Appointment Clerk, 237.367-010, 1991 WL 672185; DOT, Data Entry Clerk, 203.582-054, 1991 WL 671700. The DOT defines reaching as "extending hand(s) and arm(s) in any direction," and "does not specify the type of reaching involved" or distinguish between unilateral and bilateral reaching. *Pearson*, 810 F.3d at 210–11. With this ambiguity, the ALJ is required to seek an explanation from the vocational expert that provides a reasonable basis for the expert's testimony. *See id*.

As it relates to Kimberly's prior work as an administrative services manager and medical secretary, the VE testified that the two positions "require frequent reaching bilaterally," but claimed that these occupations did not require more than occasional overhead reaching with the non-dominant hand. R. 66. More succinctly, the VE testified Kimberly could perform the essential tasks and functions because her non-dominant extremity was limited (versus her dominant extremity). *Id*. In his decision, the ALJ addressed the VE's testimony stating that he "evaluated the testimony of the vocational expert in light of the provisions of Social Security Ruling 00-4p in finding that testimony to be credible." R. 27. Although the ALJ could have engaged in a more thorough discussion on this point, I find that he satisfied the requirements in *Pearson*.

When discussing the positions of receptionist, appointment clerk, and data entry clerk, the VE addressed that the DOT does "not specifically address unilateral work with one arm or the other," and that his opinion Kimberly could perform these occupations was based on his own knowledge, understanding, and experience in the field of vocational rehabilitation. R. 67. The ALJ then addressed the VE's testimony in his decision stating the following:

13

> When asked if there were any conflicts, apparent or otherwise, between the occupations identified in response to the hypotheticals and the <u>Dictionary of Occupational Titles</u>, the vocational expert confirmed that there were no conflicts, but stated that issues not considered by the <u>DOT</u>, such as overhead reaching, productivity, and absenteeism, were based on knowledge, understanding, and experience in the field. As such, pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the <u>Dictionary of Occupational Titles</u>.

R. 28–29.

As provided in SSR 00-4p, a reasonable explanation for apparent conflicts between the VE testimony and the DOT can be based upon a VE's "experience in job placement or career counseling." SSR 00-4p, 2000 WL 1898704, at *2. As noted above, the VE in this case provided this exact reasoning in response to the ALJ's questions regarding the apparent conflict. Kimberly claims the VE's testimony is not credible and should not be relied on by the ALJ based upon his testimony that he had not recently personally observed the positions he identified Kimberly can perform. However, as the Commissioner clarified in his brief, SSR 00-4p does not require personal observation, but is based upon the VE's cumulative experience. The VE, Robert Lester, M.S., has been a vocational expert for more than 25 years. R. 366–67. Further, in reviewing for substantial evidence, I am not tasked with making credibility determinations. *Mastro*, 270 F.3d at 176.

As for Kimberly's argument regarding the VE's testimony related to the number of available positions in the national economy, I also find this argument is without merit. When questioned on this issue, the VE testified he relied upon a "variety of sources" including data from the U.S. Department of Labor, Bureau of Labor Statistics, DOT, and a number of other databases. R. 73. I find substantial evidence supports the ALJ's determination that the VE's testimony was reliable regarding the number of available jobs in the national economy.

Accordingly, I find that the ALJ adequately resolved any apparent conflict between the VE's testimony and the ambiguous information contained in the DOT in accordance with *Pearson*. I further find that substantial evidence supports the ALJ's determination to rely upon the VE's testimony. Therefore, I find that substantial evidence supports the ALJ's determinations at steps four and five.

## II. The ALJ did not err by finding Kimberly's psychological impairments are non-severe

Kimberly argues that the ALJ's conclusion that Kimberly's adjustment disorder and generalized anxiety disorder are non-severe impairments is not supported by substantial evidence. ECF No. 8 at 15–16.[5] In support of her argument, she essentially summarizes the evidence considered by the ALJ and requests this Court reweigh the evidence and reach a different conclusion. I find that there is substantial evidence to support the ALJ's conclusion that Kimberly's mental impairments of adjustment disorder, depression, and generalized anxiety disorder are non-severe.

An impairment is non-severe when it causes no significant limitations in the claimant's ability to work. 20 C.F.R. § 404.1521(a). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). Additionally, an impairment must last, or be expected to last for a continuous period of at least 12 months to be considered "severe." 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). Kimberly bears the burden of proving that her anxiety,

---

[5] Although Kimberly does not raise the issue of the ALJ's conclusion regarding Kimberly's depression, the undersigned will consider the ALJ's analysis and conclusion regarding all of Kimberly's psychological impairments.

15

adjustment disorder, and depression are severe impairments. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (stating that the claimant bears the burden of showing that she has a "severe" impairment).

When evaluating mental impairments, the Regulations require the ALJ to use a special technique to rate a claimant's degree of limitation in each of the functional areas based on the extent to which her impairment "interferes with the [] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). The four functional areas include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)(2)(b), § 12.04(B). A rating of "none" or "mild" generally calls for a conclusion that the impairments are not severe unless the evidence indicates more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(l). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step.

Here, the ALJ found Kimberly's "medically determinable mental impairments of adjustment [dis]order, depression, and generalized anxiety disorder, considered singly and in combination, do not cause more than minimal limitation in [her] ability to perform basic mental work activities and are therefore non-severe." R. 18. The ALJ found no limitation in the functional areas of understanding, remembering, or applying information, interacting with others,

and adapting or managing oneself, and a mild limitation in concentrating, persisting, or maintaining pace. R. 18–19.

In understanding, remembering, or applying information, the ALJ noted that the medical evidence, including mental status reports, generally showed no deficits in long-term memory, short-term memory, insight, and judgment. R. 18. The ALJ further noted that Kimberly's examinations routinely described her insight and judgment as excellent, her memory as intact, and her concentration as good. *Id*. Further, the ALJ outlined relevant activities of daily living, and noted that she generally did not complain of symptoms related to understanding and remembering to her providers. *Id*.

In interacting with others, the ALJ provided that the medical evidence shows that she generally interacted normally with all providers who noted she was pleasant, cooperative, and in no distress. R. 19. The ALJ also noted that Kimberly reported no serious problems to her treating practitioners regarding interactions with others, other than a few marital difficulties and dealing with stress related to her granddaughter. *Id*.

In determining a mild limitation in concentrating, persisting, or maintaining pace, the ALJ noted that the medical evidence shows Kimberly generally did not complain to providers of serious issues in this domain, she often reported adequate symptom control from psychiatric medications, and her providers did not observe that she was overly distractible or slow. *Id*. The ALJ cited to Kimberly's activities of daily living that required some concentration and persistence, noting she watched television, read for pleasure, and would go shopping. *Id*.

In adapting or managing oneself, the ALJ noted that Kimberly did not usually complain about serious problems in this domain and that observations of her treating providers generally showed she had no deficiencies in hygiene and wore appropriate attire. R. 20. The ALJ noted

17

that she was able to handle the mental demands of parenting, although it caused some stress, and had no problems independently making plans and setting goals. *Id*. The ALJ also provided that Kimberly was able to handle her own activities of daily living without significant assistance from others. *Id*.

In sum, because Kimberly's medically determinable mental impairments caused no more than mild limitations in any of the functional areas and the evidence does not otherwise indicate a more than minimal limitation in Kimberly's ability to do basic work activities, the ALJ found her mental impairments non-severe. R. 20; *see also* 20 C.F.R. § 404.1520a(d)(1) (stating that a rating of "none" or "mild" generally calls for a conclusion that the impairments are not severe unless the evidence indicates more than a minimal limitation in the claimant's ability to do basic work activities).

Kimberly claims the ALJ's conclusion that her mental impairments are non-severe is erroneous because there "is overwhelming evidence demonstrating [Kimberly's] alleged mental health impairments significantly affected her ability to carry out basic work activities." ECF No. 8 at 16. Kimberly cites to her mental health treatment with Holly McCloud, LMFT, and Michie Bolden, PMHNP, claiming her "mental health treatment encompassed regular counseling sessions and a monitored and adjusted pharmaceutical regimen." *Id*. Kimberly also cites to McCloud's Medical Source Statement providing a number of work limitations based upon her mental health impairments. *Id*.

Contrary to Kimberly's argument, the ALJ adequately discussed the medical evidence, including her treatment records and the opinion evidence of McCloud, along with the state agency consultants, and reached a conclusion supported by substantial evidence that Kimberly's mental impairments are non-severe. As detailed above, the ALJ cites to a number of Kimberly's

treatment records in support of his determination regarding the four broad areas of mental functioning, as well as a lengthy summary of her medical records in his decision. R. 18–20, 25–26. Further, the ALJ's assessment of Kimberly's mental impairments is also consistent with the conclusion of state agency psychological consultants who found Kimberly's mental impairments non-severe. R. 25. The ALJ provided a lengthy analysis of McCloud's opinion and found it unpersuasive as it is not consistent with or supported by the record..

Kimberly does not cite to any evidence that was ignored by the ALJ, rather she requests the Court reach a different conclusion in consideration of the same evidence in the ALJ's decision. However, in reviewing for substantial evidence, "[the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Accordingly, I find that substantial evidence supports the ALJ's conclusion that Kimberly's mental impairments were non-severe.

## CONCLUSION

For the above reasons, it is **RECOMMENDED** that an order be entered **DENYING** Kimberly's Motion for Summary Judgment, ECF No. 7; **GRANTING** the Commissioner's Motion for Summary Judgment, ECF No. 13; **AFFIRMING** the Commissioner's final decision denying Kimberly's DIB claim; and **DISMISSING** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record and any unrepresented parties.

    Entered: March 8, 2024

    C. Kailani Memmer
    United States Magistrate Judge